CUNNIEN, Respondent, vs. SUPERIOR IRON WORKS COMPANY and another, Appellants.

*September 22—October 18, 1921.*

*Automobiles: Negligence: Collision with person descending from wagon: Failure to keep lookout: Sounding of horn: Contributory negligence: Questions for jury: Damages: Payments by third persons.*

1. It is the duty of the driver of an automobile to keep a reasonably careful lookout that he may be able to avoid a collision; and the question whether he has fulfilled his duty in regard to watching for pedestrians and other persons is generally for the jury.

2. While no rule of law requires the driver of an automobile to sound his horn on approaching a street intersection, the statute provides that the automobile be equipped with a suitable horn or signal device; and the purpose of the statute was to enable a driver to give proper warning under any circumstances where such warning would avert an accident.

3. Where defendant, driving an automobile in broad daylight on a wide, paved street, overtook a dray upon which plaintiff was riding, and when the dray stopped turned to the left to pass it, and in passing came unnecessarily so close to the dray as to strike the plaintiff while he was alighting from it, the question of the negligence of the defendant in failing to keep a proper lookout and in not giving warning of his approach is for the jury.

4. Whether plaintiff was contributorily negligent in descending from the dray on the side towards the street and not next to the curbing and placing one foot down on the pavement without looking for automobiles, is a question for the jury.

5. Under the federal Vocational Rehabilitation Act (40 U. S. Stats. at Large, 617, ch. 107) no deduction should be made from the damages awarded by a jury for personal injury because of compensation received by the plaintiff during a portion of the time he was disabled.

APPEAL from a judgment of the circuit court for Douglas county: W. R. FOLEY, Circuit Judge. *Modified and affirmed.*

The appeal is from a judgment in favor of the plaintiff and against the defendants, and cross-appeal by the plaintiff.

Ogden avenue is a paved street in the city of Superior extending north and south, and at the point of the accident is forty feet wide from curb to curb, and is intersected by Belknap street at right angles, there being on said last named street a line of street cars.

The plaintiff at the time of the trial in September, 1920, was twenty-two years of age, and had been a railroad car-seat upholsterer from the time he was seventeen years of age until he arrived at the age of twenty years, when he enlisted in the United States navy in the month of April, 1917. On July 19, 1919, while on a furlough, he came to Superior and assisted a drayman by the name of Young in the moving of his mother's furniture from her former home

in the city of Superior to the freight depot.   Immediately
prior to the happening of the injury the dray on which the
plaintiff and the driver, Young, were seated was returning
from the freight yards empty, the dray being driven south on
the west side of Ogden avenue, the horse going at a slow
trot or walking up to the point where it stopped, about ten
feet north of the north crossing at the intersection of Bel-
knap street, in order to permit the plaintiff to alight from the
wagon.   The dray box had sides to it about two feet high
and the seat was elevated about five and one-half feet from
the street.   The driver sat on the right-hand side of the seat,
while the plaintiff sat on the left-hand side.

   There is very little dispute in the evidence as to the actual
facts in the case.   The defendant *Hayes,* who was the
president of the defendant company, immediately preceding
the accident was driving a single-seated six-cylinder Saxon
car, used in the business of the defendant *Superior Iron
Works Company,* south on Ogden avenue, from the Y. M.
C. A. building, and when he caught up with the dray, which
had stopped as stated, within a distance of about ten feet
from the north crossing of Ogden avenue and Belknap
street, turned to the left in order to pass the dray and
thereafter proceed on his course.   Immediately after the
dray had been stopped the plaintiff started to alight there-
from, and in doing so faced the west and stepped down
backwards, first stepping on the tongue of the wagon with
one foot, then with the other foot on the hub, and then
down onto the pavement.   He still clung with his hands to
the dray at the time of the accident, and it appears from the
evidence that he had alighted on the pavement with only
one foot, such foot being a distance of about a foot east of
the wagon wheel, the other foot being still on the hub of
the wheel.   While the plaintiff was so alighting the de-
fendant *Hayes* was passing around the dray towards the
east, and in proceeding along the highway came so close
to the dray that his automobile struck the plaintiff, causing

him to be thrown upon the pavement and to sustain the injuries complained of.

It also appears quite conclusively that immediately prior to the happening of the accident the automobile was driven at a rate of speed between seven and eight miles an hour and that no horn or signal was blown or sounded to attract the attention of the plaintiff or to warn him of the approach of the machine.

The testimony also shows that the plaintiff, prior to the time he attempted to alight from the dray, did not look towards the north in order to discover the approach of an automobile.

After the collision the automobile of the defendant *Hayes* swerved off to the left, across Ogden avenue, and stopped close to the east curb. There were no automobiles excepting the one in question going along either side of Belknap street, and the evidence shows that there was little traffic at the time in question on either of the streets.

The case was submitted to the jury on a special verdict, and the jury found in its answer to question number 2 that the defendant *Hayes* failed to exercise ordinary care in the operation of the automobile as it approached and collided with the plaintiff; and in answer to question number 3 found that such failure to exercise ordinary care was the proximate cause of plaintiff's injury; and also found that no want of ordinary care on the part of the plaintiff proximately contributed to produce the injury.

The defendants contend, first, that there was no evidence in the case under which they could be found guilty of negligence, and second, that the evidence in the case conclusively shows that the plaintiff, at the time of the happening of the accident, was guilty of contributory negligence, and that therefore defendants' motion for nonsuit or for the direction of a verdict should have been granted; and that after verdict the answer to the question in which it was found that the defendant *Hayes* was guilty of negligence should

have been set aside; that such answer should have been changed from "Yes" to "No;" that the answer by which the plaintiff was held to be free from contributory negligence should have been changed from "No" to "Yes;" and that judgment should have been entered in favor of the defendants and against the plaintiff dismissing plaintiff's complaint, etc.

For the appellants there was a brief by *Pickering & Rieser* of Superior, and oral argument by *R. M. Rieser.*

For the respondent the cause was submitted on the brief of *Dietrich & Dietrich* of Superior.

DOERFLER, J.    Did the evidence warrant submission of the question involving defendants' negligence to the jury?

The accident happened at about noontime on a clear day in the month of July. The defendant *Hayes,* with his automobile, was coming along the west side of Ogden avenue, and from the time that he approached the dray up to the time of the happening of the accident the dray and the occupants thereof were fully within his view. The machine was driven at a rate of speed between seven and eight miles per hour, and, assuming that the appliances on the machine were in proper order, the machine was at all times within the easy control of the driver, so that he could readily pursue any course, by either swerving his machine to the left a sufficient distance away from the dray or by stopping it, and thus avoid the accident.

It is the duty of the driver of a machine to keep a reasonably careful lookout so that he may be able to avoid a collision, and whether a driver has fulfilled his duty in regard to watching for pedestrians and other persons is generally a question for the jury. Huddy, Automobiles (5th ed.) sec. 332.

Sec. 1636—52; Stats., among other things, provides:

"Every automobile . . . while being used upon any public highway of this state, shall be provided with efficient brakes and an adequate bell, horn or other signal device."

The legislature evidently realized the necessity for enacting a provision requiring the presence of a suitable horn or signal device upon every automobile propelled along the streets in this state, and the only object and purpose which that body could have had in mind in the enactment of such a precaution was to enable the driver of a machine to give a proper warning of his approach under any circumstances, where such warning would be liable to prevent an accident.

It is true that this court has held that there is no rule of law which requires an automobilist to sound his horn in approaching a street intersection; however, that was not intended to convey the idea that the horn or signal device was a useless appliance, but that a warning or signal by use of such horn or device would be necessary, in the exercise of reasonable care, wherever there was anticipated danger which could be averted by the giving of a proper timely signal. Therefore the matter of the negligence of the defendant presented a proper question for the jury, both upon the theory that the defendant *Hayes* did not keep a proper lookout and that he did not seasonably, by means of his automobile horn, sound a warning of danger. Furthermore, while going at the rate of seven or eight miles an hour and under circumstances from which it must be assumed that he had full control of his machine, it is very questionable indeed whether he could not be deemed guilty of negligence, under the circumstances, in driving his machine so close to the dray while passing it as to leave a space of but one foot between his machine and the wheels of the dray. As stated, there was no other vehicle or pedestrian on Ogden avenue; the street was forty feet wide; the dray stood between one and three feet from the west curb of Ogden avenue, and there was ample space, even on the west side of the street, for the defendant *Hayes* to pass the dray without in any way endangering the plaintiff under the circumstances detailed herein. This also was a proper matter to submit to the jury under all the facts and circumstances in the case in order to determine the question

of negligence. The question of the negligence of the defendant *Hayes,* if any, was therefore properly submitted to the jury.

Questions of negligence arising out of automobile accidents are peculiarly for the jury and will not be decided as a matter of law except under the clearest circumstances. *Groeschner. v. John Gund B. Co.* 173 Wis. 366, 181 N. W. 212.

What was said in the case of *Shortle v. Sheill,* 172 Wis. 53, 178 N. W. 304, is strictly applicable to the instant case:

"There is no yard-stick by which it may be determined whether any given action amounts to ordinary care. The decision must of necessity be a matter of human judgment. This is signally true in automobile accident cases. Whether the conduct of one charged with responsibility for an automobile accident amounts to negligence is in the vast majority of cases a question calling for the exercise of human judgment and one upon which men are very likely to differ. In these days, when automobiles are in well-nigh universal use, who is better qualified to pass final judgment upon such matter than a jury, who can apply to the facts of the case a collective and varied experience? The daring, the reckless, the moderate, the careful, and the timid driver, as well as the pedestrian and he who still clings to Old Dobbin, all find their way to the jury box, and the decision of the jury upon these questions reflects a judgment founded upon varied views, sympathies, and experiences which a court can disregard only when palpably unsupported by evidence or inconsistent with law."

We come now to the question submitted to the jury in the special verdict involving the contributory negligence of the plaintiff. In this connection it must be borne in mind that the plaintiff did not look towards the north before climbing down from the wagon and that he proceeded to climb down backwards in the manner heretofore stated. To hold that the plaintiff would be guilty of contributory negligence as a matter of law, under the facts and circumstances detailed in the evidence, would appear to establish a very harsh rule

indeed. In determining the question of negligence the traffic on the street must be taken into consideration, the width of the street, and all the surrounding facts and circumstances. It is true, had the plaintiff after alighting, with one foot on the pavement, proceeded without looking to cross the highway and then had been struck, it would be quite clear that under the decisions there would be little difficulty in finding that he was guilty of contributory negligence as a matter of law. However, in the instant case he had only partially alighted from the vehicle. There is sufficient evidence to warrant the conclusion that the foot which had settled on the pavement was not to exceed one foot distant from the dray. The injury would have resulted even though it had been the intention of the plaintiff to pass forward towards the south around the wagon and to gain access to the west sidewalk in that manner; or it would have happened if he had merely stepped down from the dray and had stood within one foot of the dray intending to discuss some matter with the driver; or if he had alighted from the dray for the purpose of either examining some portion of the dray on the traffic side or of attending to some slight repair upon the wagon. It would seem that whether or not the plaintiff was guilty of contributory negligence in doing what he did at the time of the happening of the collision presented a situation which, like the negligence of the defendant *Hayes*, constituted a proper jury question. At least it has been so held by courts of last resort of eminent respectability. *Deitchler v. Ball*, 99 Wash. 483, 170 Pac. 123; *Undhejem v. Hastings*, 38 Minn. 485, 38 N. W. 488; *Kathmeyer v. Mehl* (N. J.) 60 Atl. 40.

While other courts of eminent standing have held to the contrary doctrine in cases somewhat similar to the instant case, the very fact that there should be a dispute among learned judges upon the question involved in this case on contributory negligence would make it appear clear that under the rulings of this court the matter of contributory

negligence is a proper subject to be submitted to and decided by a jury; and what has been quoted and said in the case of *Shortle v. Sheill, supra,* is equally applicable to the question of the plaintiff's contributory negligence as it is with respect to the negligence of the defendant *Hayes.* We have arrived at this conclusion not without considerable difficulty, but after mature consideration. In view of our former holdings and what has been heretofore said and referred to, we hold that the contributory negligence of the plaintiff is a proper matter to be submitted to the jury.

In answer to the fifth question of the special verdict, namely, "What sum will fairly compensate plaintiff for the damages he has sustained?" the jury answered "$3,250." The jury further answered that of said amount the sum of $1,500 is allowed as damages for loss of earnings since March 8, 1920, and judgment was rendered in favor of the plaintiff and against the defendants for the sum of $1,725 and costs, etc.

The plaintiff in his cross-appeal contends that it was error for the trial court to deduct the sum of $1,500 from the total amount of the damages, namely, $3,250, and to render judgment as aforesaid.

The plaintiff's injury consisted of a simple fracture of the tibia of the right limb, about an inch below the knee joint. Dr. Ground testified that the bone at the point of the injury, in hardening ossifies separately from the shaft and the part which involves the new joint. The injury twisted and bent the bone at the joint, and the ligaments lifted the epiphyllum cap off the shaft of the bone. That is what is called an epiphysical fracture. It is a weak point naturally, and the two pieces of the bone do not become ossified or thoroughly fastened together until the person becomes twenty-four or twenty-five years of age, and then they become very firm, and the injury was such as to bend the bone and lift the shaft right off of the tibia. The doctor treated the plaintiff about two months in St. Mary's

hospital at Superior, and thereafter, when the plaintiff went to St. Paul, he still had some retentive dressing on his limb. The injury will naturally constitute a weak place for a few years. The fact that the bone has been immobilized for so long a time makes the joint stiff and the tissues around the joint have become thickened, and that thickening has to be absorbed before the joint can be used normally, and that always takes a considerable time. The doctor further testified that he would expect it to take a year, or possibly a year and a half, before conditions would become reasonably normal.

The plaintiff testified that since his injury he was able to work, with great difficulty, inconvenience, and pain, at his regular employment for a period of about one week, for which he earned the sum of $34, but that the condition of his limb was such as to prevent him from continuing in his employment, and that such disability continued up to the time of the trial.

In December, 1918, the plaintiff filed his application for a discharge from the navy, and his four-year term was changed automatically to one which continued during the duration of the war. He received his discharge from the navy on October 29, 1919. From the time of the happening of the injury up to the time of his discharge from the navy the plaintiff received his usual compensation from the government amounting to $45 a month.

The plaintiff thereafter presented an application for vocational training under an act of Congress, and for a period of one year thereafter, under the provisions of said act, he was afforded an opportunity to improve himself in the business of general upholsterer so as to enable him to pursue a gainful occupation. The work required under the Vocational Rehabilitation Act was not so strenuous, nor did it require the person to kneel or to stand to any considerable degree while so employed. Under this Vocational Rehabilitation Act the plaintiff received from March 8, 1920, the

sum of $120 per month, and for a portion of the time his employer paid him the sum of $6 per week, which was subsequently raised to $10 per week.

The lower court instructed the jury that inasmuch as the government paid plaintiff's salary of $45 a month to him until the time of his discharge on October 29, 1919, nothing was to be allowed to him prior to said date for loss of earnings. The jury was further instructed that in arriving at plaintiff's loss of earnings they were to leave out of consideration the $120 per month which the plaintiff received from the government under the Vocational Rehabilitation Act, and find his loss of earnings, if any, just the same as if he did not receive any money from the government.

Plaintiff testified that since his injury and up to the time of the trial he would have been able to earn seventy-two and one-half cents per hour in his former occupation had he been able to resume it, and that since plaintiff was injured the compensation for railway car upholsterers has materially increased.

The jury was instructed also by the lower court to answer separately the amount awarded to the plaintiff for damages since March 8, 1920, and the jury fixed said sum at $1,500, and this amount was subsequently in the judgment deducted from the total amount of the plaintiff's damages as aforesaid.

The plaintiff in his cross-appeal now raises the question that in making such deduction the court committed error, and that the total damages should be by the judgment fixed at $3,250 instead of $1,725.

The Vocational Rehabilitation Act, which was enacted on June 27, 1918 (40 U. S. Stats. at Large, 617, ch. 107), among other things provides as follows:

Sec. 2. "Every person who is disabled under circumstances entitling him, after discharge from the military or naval forces of the United States, to compensation under article III of the act entitled 'An act to amend an act entitled

"An act to authorize the establishment of a Bureau of War Risk Insurance in the Treasury Department," ' approved October sixth, nineteen hundred and seventeen, hereinafter referred to as 'said act,' and who, after his discharge, in the opinion of the board, is unable to carry on a gainful occupation, . . . shall be furnished by the said board, where vocational rehabilitation is feasible, such course of vocational rehabilitation as the board shall prescribe and provide.

"The board shall have power, and it shall be its duty, to furnish the persons included in this section suitable courses of vocational rehabilitation to be prescribed and provided by the board, and every person electing to follow such a course of vocational rehabilitation shall, while following the same, receive monthly compensation equal to the amount of his monthly pay for the last month of his active service, or equal to the amount to which he would be entitled under article III of said act, whichever amount is the greater. If such person was an enlisted man at the time of his discharge, for the period during which he is so afforded a course of rehabilitation, his family shall receive compulsory allotment and family allowance according to the terms of article II of said act in the same manner as if he were an enlisted man, and for the purpose of computing and paying compulsory allotment and family allowance his compensation shall be treated as his monthly pay: Provided, that if such person wilfully fails or refuses to follow the prescribed course of vocational rehabilitation which he has elected to follow, in a manner satisfactory to the board, the said board in its discretion may certify to that effect to the bureau and the said bureau shall, during such period of failure or refusal, withhold any part or all of the monthly compensation due such person and not subject to compulsory allotment which the said board may have determined should be withheld. . . .

"No compensation under article III of said act shall be paid for the period during which any such person is furnished by said board a course of vocational rehabilitation except as is hereinbefore provided."

Article III above referred to provides for compensation to be paid on account of the death of one serving in the army or the navy or for partial or total or temporary or permanent disability.

Article II of the act, entitled "War Risk Insurance," provides for compulsory and voluntary allotments for the benefit of the wives and families, which allotments are deducted and paid directly by the government to the dependents.

Sec. 18, ch. 104, 40 U. S. Stats. at Large, p. 613, pertaining to war risk insurance, provides as follows:

"(1) That if an injury or death for which compensation is payable under this article is caused under circumstances creating a legal liability upon some person other than the United States or the enemy to pay damages therefor, the director, as a condition to payment of compensation by the United States, may require the beneficiary to assign to the United States any right of action he may have to enforce such liability of such other person, or if it appears to be for the best interests of the beneficiary the director may require him to prosecute the said action in his own name, subject to regulations. The director may require such assignment or prosecution at any time after the injury or death, and the failure on the part of the beneficiary to so assign or to prosecute said cause of action in his own name within a reasonable time, to be fixed by the director, shall bar any right to compensation on account of the same injury or death. The cause of action so assigned to the United States may be prosecuted or compromised by the director, and any money realized or collected thereon, less the reasonable expenses of such realization or collection, shall be placed to the credit of the military and naval compensation appropriation. If the amount placed to the credit of such appropriation in such case is in excess of the amount of the award of compensation, if any, such excess shall be paid to the beneficiary after any compensation award for the same injury or death is made."

In the next paragraph this section provides that if a recovery has been had as the result of the suit brought or of a settlement, the amount so obtained shall be credited upon any compensation payable or which may become payable to such beneficiary. Said section further provides:

"(2) If an injury or death for which compensation may be payable under this article is caused under circumstances

creating a legal liability upon some person, other than the United States or the enemy, to pay damages therefor, then, in order to preserve the right of action, the director may require the conditional beneficiary at any time after the injury or death, to assign such right of action to the United States, or, if it appears to be for the best interests of such conditional beneficiary, to prosecute the said cause of action in his own name, subject to regulations. The failure on the part of the beneficiary to so assign or to prosecute the said cause of action in his own name within a reasonable time, to be fixed by the director, shall bar any right to compensation on account of the same injury or death. The cause of action so assigned may be prosecuted or compromised by the director, and any money realized or collected thereon, less the reasonable expenses of such realization or collection, shall be paid to such beneficiary, and be credited upon any future compensation which may become payable to such· beneficiary by the United States on account of the same injury or death."

On June 5, 1920, ch. 253 (41 U. S. Stats. at Large, p. 1021) was enacted by Congress, which among other things provides as follows:

"That the board may, after June 30, 1920, pay, subject to the conditions and limitations prescribed by section 2 of the Vocational Rehabilitation Act as amended, to all trainees undergoing training under said section residing where maintenance and support is above the average and comparatively high, in lieu of the monthly payments for maintenance and support prescribed by section 2, as amended, such sum as in the judgment of the said board is necessary for his maintenance and support and for the maintenance and support of persons dependent upon him, if any: Provided, however, that in no event shall the sum so paid such person while pursuing such course be more than $100 per month for a single man without dependents, or for a man with dependents $120 per month, plus the several sums prescribed as family allowances under section 204 of article II of the War Risk Insurance Act."

The federal statutes above quoted and referred to make it clear that Congress first intended to provide for those engaged in the military and naval service, and who had

sustained injury, compensation for disability, which compensation matured after the discharge of the soldier or sailor, and which compensation was subject to compulsory allotment for the benefit of dependents in the same manner as the compensation received in the form of monthly pay was subject while such soldier or sailor was in service.

Article III above referred to is a separate and independent article and has no connection with article IV, which provides for soldiers' and sailors' insurance. It is very clear that Congress had in mind, at the time of the enactment of the foregoing statutes, not only to relieve in a measure those who had served the government during the period of the war, but also to afford them some compensation by way of appreciation and gratitude for the great sacrifices made. And it cannot logically be maintained that these enactments were brought about or had in view any thought of relieving those who were guilty of wrongdoing towards any one engaged in the military or naval service of the United States.

The plaintiff, after his discharge, from March 8, 1920, took advantage of the statutes pertaining to vocational rehabilitation and received the maximum provided for under said statute, and in addition thereto received from his direct employer, up to the month of July, 1920, the sum of $6 per week by way of additional compensation, and thereafter the sum of $10 per week.

Sec. 2 of the act of 1918, referred to above (40 U. S. Stats. at Large, 617, ch. 107), provides that no compensation under article III of said act shall be paid for the period during which any such person is furnished by said board a course of vocational rehabilitation, showing that the amount allowed by way of compensation during the vocational rehabilitation period is substituted for the amount of the compensation provided for in article III; and said last named section also provides that in order to enable one to take advantage of the Vocational Rehabilitation Act he must have

been disabled under circumstances entitling him, after discharge from the military or naval forces, to compensation under said article III. So that the Vocational Rehabilitation Statutes really act for the time being as a substitute for and a supplement to the provisions of said article III, and under said article III all causes of action and all amounts recovered belong to the United States and must be ultimately credited to the military and naval compensation appropriations; so that in any event it appears that whatever is ultimately realized out of this suit goes to the credit of the United States and does not constitute or give to the plaintiff double compensation for the damages sustained for loss of time.

It has been held by this court in *Gatzweiler v. Milwaukee E. R. & L. Co.* 136 Wis. 34, 116 N. W. 633, that the amount received by an injured party under an accident policy for which he has paid the premiums cannot be considered by way of partial or total satisfaction of damages claimed by such injured person from a tortfeasor.

In *Harding v. Townshend*, 43 Vt. 536, 5 Am. Rep. 304, which was an action for an injury caused by a defect in a highway, defendant claimed to have the amount received by plaintiff on an accident insurance policy deducted from the recovery, but the court said:

"There is no technical ground which necessarily leads to the conclusion that the money received by the plaintiff of the accident insurance company should operate as a defense, or inure to the benefit of the defendant. The insurer and the defendant are not joint tortfeasors or joint debtors, so as to make a payment or satisfaction by the former operate to the benefit of the latter. Nor is there any legal privity between the defendant and the insurer, so as to give the former a right to avail itself of a payment by the latter. The policy of insurance is collateral to the remedy against the defendant, and was procured solely by the plaintiff and at his expense, and to the procurement of which the defendant was in no way contributory."

In answer to the objection that plaintiff was not entitled to more than one recovery the court said: "Defendant was

not in a position to raise that question, since it was primarily liable for the injury." ·See, also, *Regan v. N. Y. & N. E. R. Co.* 60 Conn. 124, 22 Atl. 503; *Missouri, K. & T. R. Co. v. Rains* (Tex. Civ. App.) 40 S. W. 635; *Louisville & N. R. Co. v. Carothers,* 23 Ky. Law Rep. 1673, 65 S. W. 833; *Pittsburgh, C. & St. L. R. Co. v. Thompson,* 56 Ill. 138.

It also seems to be the prevailing doctrine in this country that where the salary of an injured person is continued by his employer during the time of his inability to perform services, such payment is no ground for diminution of the damages to be paid by the one who has caused the injury. *Williams v. St. L. & S. F. R. Co.* 123 Mo. 573, 27 S. W. 387; *Ohio & M. R. W. Co. v. Dickerson,* 59 Ind. 317; *Elmer v. Fessenden,* 154 Mass. 427, 28 N. E. 299; *Missouri Pac. R. Co. v. Jarrard,* 65 Tex. 560.

New York and Alabama courts seem to hold the contrary view.

From the foregoing statutes we hold that the lower court, in reducing the amount of the plaintiff's damages for loss of earnings since March 8, 1920, in the sum of $1,500, committed error, and that the judgment should be for the full amount of the damages as found by the jury, namely, $3,250.

The judgment of the lower court is therefore modified accordingly, and, as so modified, affirmed.

*By the Court.*—It is so ordered.